851 P.2d 95

**EL PASO NATURAL GAS COMPANY, a Delaware corporation; The Atchison, Topeka and Santa Fe Railway Company, a Delaware corporation; Black Mesa Pipeline, Inc., a Delaware corporation; Mountain States Telephone and Telegraph Company, a Colorado corporation, doing business as U.S. West Communications, Plaintiffs–Appellants,**

v.

**ARIZONA DEPARTMENT OF REVENUE; Coconino County; Williams Hospital District, a special taxing district, Defendants–Appellees.**

No. 1 CA–TX 91–003.

Court of Appeals of Arizona, Division 1, Department T.

July 16, 1992.

As Corrected July 28, 1992.

Reconsideration Denied Oct. 2, 1992.

Review Denied May 18, 1993.

Stompoly & Stroud, P.C. by Stephen A. Thomas, Tucson, for plaintiff-appellant El Paso Natural Gas Co.

Fennemore, Craig, P.C. by Timothy Berg, Paul J. Mooney, Phoenix, for plaintiffs-appellants Atchison, Topeka and Santa Fe Ry. Co., U.S. West Communications, Black Mesa Pipeline, Inc.

Gust, Rosenfeld & Henderson by Fred H. Rosenfeld, Phoenix, for defendant-appellee Williams Hosp. Dist.

Terence C. Hance, Chief Deputy County Atty., Flagstaff, for defendant-appellee Coconino County.

Grant Woods, Atty. Gen. by Steven R. Partridge, Asst. Atty. Gen., Phoenix, for defendant-appellee Arizona Dept. of Rev.

## OPINION

CONTRERAS, Judge.

Appellants El Paso Natural Gas Co., The Atchison, Topeka and Santa Fe Railway Co., Black Mesa Pipeline, Inc., Mountain States Telephone and Telegraph Co., and U.S. West Communications have appealed from a summary judgment entered by the tax court in favor of appellee Williams Hospital District ("the District"). The tax court ruled that the District had legal authority to impose a secondary property tax for the operation and maintenance of its hospital for the tax years 1988 and 1989. The appeal presents the following issues:

(1) whether the District was authorized, under section 48–1907(A)(6) of the Arizona Revised Statutes Annotated ("A.R.S."), to impose a secondary property tax for the 1988 tax year on the theory that the District "operated" its own hospital during that year pursuant to a retroactive agreement between the District and Samaritan Health Services;

(2) whether the 1988 Arizona Session Laws, chapter 141, section 2, which authorized any hospital district that levied a secondary property tax for funding the operation and maintenance of a hospital for fiscal year 1987–88 to levy a similar tax for fiscal year 1988–89, was a special law in violation of the Arizona Constitution, article IV, part 2, section 19;

(3) whether the 1989 Arizona Session Laws, chapter 254, section 2, which authorized a hospital district that "owned OR operated" a hospital to levy a secondary property tax, applied to the 1989 tax year;

(4) whether the District was disqualified from imposing a secondary property tax

for the 1989 tax year because it did not lease its hospital under the terms of A.R.S. section 48–1911; and

(5) whether the District's attempt to lease its hospital by auction excused its failure to lease the hospital under the terms of A.R.S. section 48–1911(A).

We reverse the tax court's judgment and remand for further proceedings. We hold: (1) that the District was not entitled to levy a secondary property tax for 1988 under A.R.S. section 48–1907(6) because the only evidence produced indicated that Samaritan, and not the District, continued to operate the hospital until December of 1989; (2) that the 1988 Arizona Session Laws, chapter 141, is an unconstitutional special law and therefore did not authorize the District's 1988 secondary property tax levy; and (3) that the 1989 Arizona Session Laws, chapter 254, section 2, which removed the requirement of A.R.S. section 48–1907(6) that a hospital district "operate" its hospital in order to levy a secondary property tax, was not effective until September 15, 1989, and therefore did not authorize the District's 1989 secondary property tax levy on August 21, 1989. We need not address issues 4 or 5.

## FACTS AND PROCEDURAL HISTORY

A detailed history of the Williams Hospital District and the prior litigation over its legal authority to levy secondary property taxes is contained in this court's opinion in *Atchison, Topeka & Santa Fe Railway Co. v. Arizona Department of Revenue,* 162 Ariz. 127, 781 P.2d 605 (App.1989). We borrow from that opinion in order to establish the background for the current appeal.

The District was formed in early 1974. At that time it incurred a bonded indebtedness of $500,000 in order to purchase and remodel the existing Williams Hospital Facility. The bonds, which are still outstanding and unpaid, require annual principal and interest payments of $49,000 through June of 1994.

From April of 1974 through August of 1986, the District leased the hospital to various organizations, but no lessee was able to operate it at a profit. On July 1, 1986, the District entered into a one-year management agreement with Samaritan Health Services, Inc. ("Samaritan"), which is not a party to this litigation. On July 3, 1986, the District proposed to levy a secondary property tax pursuant to A.R.S. section 48–1907(6)[1] in order to subsidize the hospital's operating expenses. The District's voters approved the levy on August 5, 1986. In fiscal year 1986–87, revenues collected from the tax provided about forty percent of the District's $150,000 budget.

In October of 1987, the same taxpayers who have brought the instant appeal filed an action in Coconino County Superior Court to challenge the District's authority to levy secondary property taxes for 1986 and 1987. The superior court sustained the levies, but this court reversed on appeal. We held: (1) that A.R.S. section 48–1910[2]

---

**1.** Before it was amended by chapter 254, section 2, of the 1989 Arizona Session Laws, A.R.S. section 48–1907 provided in pertinent part:

A hospital district may:
....
 (6) Impose a secondary property tax on all taxable property within the district for the purpose of funding the operation and maintenance of a hospital or combined hospital and ambulance service that is owned and operated by the district or to pay costs of an ambulance service contract entered into pursuant to this section.... The continued imposition of such a tax must be approved by a majority of the qualified electors voting in a regular or special election at least every five years from the date of the initial imposition.

**2.** Section 48–1910 provides:

The board of directors may purchase surgical instruments, hospital equipment, ambulance equipment and other property and supplies necessary for equipping a hospital or combined hospital and ambulance service, except that the board shall not purchase, rent or contract for the use of aircraft. The board may purchase real property, and erect or rent and equip buildings or rooms necessary for the hospital. The board of directors shall lease the hospital as provided by § 48–1911, provided however that when any bonded indebtedness of the district has been paid the board of directors may lease the hospital and its equipment to any person or corporation for the purpose of conducting a health care facility upon such terms and conditions as the board of directors of the district deems to be beneficial to the hospital district.

did not require a hospital district with bonded indebtedness to lease its hospital on the conditions specified in A.R.S. section 48–1911[3] in lieu of imposing a secondary property tax pursuant to A.R.S. section 48–1907(6) and operating the hospital itself; (2) that under A.R.S. section 48–1907(6), the District had authority to impose a secondary property tax to fund the operation and maintenance of its hospital only if it actually "operated" the Williams Hospital facility; and (3) that the District lacked authority to levy the 1986 or 1987 secondary property taxes because, pursuant to the management agreement in effect between Samaritan and the District, it was Samaritan that actually "operated" the facility.

On January 21, 1988, while the taxpayers' challenge to the District's 1986 and 1987 levies was still pending before the superior court, Senate Bill 1150 was introduced in the Arizona Senate. Section 1 of the bill would have amended A.R.S. section 48–1907(6) to allow a hospital district to

[i]mpose a secondary property tax on all taxable property within the district for the purpose of funding the operation and OR maintenance of a hospital or combined hospital and ambulance service that is owned and operated by the dis-

trict or to pay costs of an ambulance service contract entered into pursuant to this section.

(Capitalization indicates added language; strikeouts indicate deletions.) Section 2 of the bill would have added a new subsection (A)(5) to A.R.S. section 48–1911:

A. A lease of the hospital and its equipment, executed by the board of directors of the district, shall:

. . . . .

(5) CONTAIN TERMS AND PROVISIONS TO ALLOW THE BOARD, IF NECESSARY, TO FUND OPERATION OR MAINTENANCE COSTS PURSUANT TO SECTION 48–1907.

Senate Bill 1150 was passed with certain amendments by the Senate Committee on Government on February 24, 1988. *See* Minutes of the Committee on Government, February 24, 1988. On May 11, 1988, however, the Ways and Means Committee of the Arizona House of Representatives adopted a "strike-everything" amendment of Senate Bill 1150. This amendment was later adopted by both the House and the Senate and became effective as an emergency provision on June 1, 1988.[4] 1988 Ariz.Sess.Laws ch. 141 ("the 1988 act").

---

**3.** Before its amendment by chapter 254, section 3, of the 1989 Arizona Session Laws, A.R.S. section 48–1911(A) provided:

A lease of the hospital and its equipment, executed by the board of directors of the district, shall:
(1) Contain terms and provisions necessary to assure compliance by the district with the provisions of the federal act and any amendments thereto.
(2) Extend for a term to be determined by the board, but not less than five nor more than ten years.
(3) Be executed to a corporation not for pecuniary profit, duly organized under the laws of this state for the purpose of conducting a hospital.
(4) Provide for a rental upon terms and in an amount which will provide a fair return to the district on its investment, be sufficient to meet the payments of principal and interest of bonds issued under this article, and provide amounts necessary to meet the expenses of the district.

**4.** The 1988 Arizona Session Laws, chapter 141, provides:

Section 1. *Purpose*

The legislature recognizes that there is a potential controversy concerning the circumstances under which some hospital districts may levy secondary property taxes to fund the operation and maintenance of hospitals supported by the districts. The legislature intends to make a comprehensive review of this taxing authority and to propose a permanent legislative resolution to these issues in the thirty-ninth legislature, first regular session. In the meantime, however, the statutory authority to levy these secondary property taxes needs to be clarified for fiscal year 1988–1989. The purpose of this act, therefore, is to clarify the authority of hospital districts to levy secondary property taxes for operation and maintenance of hospitals for fiscal year 1988–1989. The legislature does not intend, by this act, to express any intent regarding original purpose or proper construction of any potentially conflicting provisions or interpretations of sections 48–1907, 48–1910 and 48–1911, Arizona Revised Statutes.

Sec. 2. *Hospital districts; continued operation and maintenance tax for fiscal year 1988–1989*

Any hospital district existing under the authority of title 48, chapter 13, article 1, Ari-

In 1989, the legislature enacted Senate Bill 1316. 1989 Ariz.Sess.Laws ch. 254 ("the 1989 act"). The 1989 act amended A.R.S. section 48–1907 to provide:

A. A hospital district may:

.    .    .    .    .

(6) Impose a secondary property tax on all taxable property within the district for the purpose of funding the operation and maintenance of a hospital or combined hospital and ambulance district that is owned ~~and~~ OR operated by the district....

The 1989 act also amended A.R.S. section 48–1911(A) to provide: "A lease of the hospital and its equipment, AS REQUIRED UNDER SECTION 48–1910 FOR DISTRICTS WITH BONDED INDEBTEDNESS, executed by the board of directors of the district shall...." The 1989 act did not include an emergency clause. The Thirty–Ninth Legislature adjourned *sine die* on June 16, 1989. The 1989 act therefore became effective on September 15, 1989. *See* Ariz.Const. art. IV, pt. 1, § 1(3) ("[T]o allow opportunity for Referendum Petitions, no Act passed by the Legislature shall be operative for ninety days after the close of the session of the Legislature enacting such measure, except such as require earlier operation to preserve the public peace, health, or safety, or to provide appropriations for the support and maintenance of the Departments of the State and of State institutions....").

The taxpayers filed the present actions in October of 1989, challenging the District's 1988 and 1989 secondary property tax levies. In both actions, the District moved to dismiss or in the alternative for summary judgment. The actions were consolidated by stipulation, and the District's motions were briefed and argued. By minute entry of November 7, 1990, the tax court granted partial summary judgment to the District on the taxpayers' challenges to the validity of the 1988 and 1989 secondary property tax levies.

The tax court rejected the taxpayers' arguments that the 1988 act was unconstitutional special legislation, that the 1989 act was inapplicable to the 1989 tax year because it was enacted without an emergency clause, and that the 1989 secondary property tax levy was invalid because the District's hospital was not leased pursuant to the requirements of A.R.S. section 48–1911. The parties later stipulated to the entry of a formal judgment that embodied these rulings and disposed of the remaining issues pending before the court. The tax-

zona Revised Statutes [A.R.S. sections 48–1901 through 48–1919], which levied a secondary property tax for the purpose of funding the fiscal year 1987–1988 operation and maintenance of a hospital or a combined hospital and ambulance service may impose a secondary property tax on all taxable property within the district for the purpose of funding the fiscal year 1988–1989 operation and maintenance of a hospital or combined hospital and ambulance service owned by the district whether or not the hospital is leased pursuant to sections 48–1910 and 48–1911, Arizona Revised Statutes. The amount of the levy necessary for the operation and maintenance of the ambulance service shall be separately stated in the levy.

Sec. 3. *Hospital district; new operation and maintenance tax for fiscal year 1988–1989*

Any hospital district existing under the authority of title 48, chapter 13, article 1, Arizona Revised Statutes, which did not levy a secondary property tax for the purpose of funding the fiscal year 1987–1988 operation and maintenance of a hospital or a combined hospital and ambulance service may impose a secondary property tax on all taxable property within the district for the purpose of funding the fiscal year 1988–1989 operation and maintenance of a hospital or combined hospital and ambulance service owned by the district subject to the following conditions:

1. If the hospital is leased pursuant to section 48–1911, Arizona Revised Statutes, the amount of the levy shall not be more than ten per cent of the fiscal year 1988–1989 budget for the operation and maintenance of the hospital or combined hospital and ambulance service.

2. Before the imposition of such a tax a majority of the qualified electors voting in a regular or special election must approve such imposition.

3. The amount of the levy necessary for the operation and maintenance of the ambulance service shall be separately stated in the levy.

Sec. 4. *Emergency*

To preserve the public peace, health and safety, it is necessary that this act become immediately operative. It is therefore declared to be an emergency measure, to take effect as provided by law.

payers timely filed a joint notice of appeal from the judgment. We have jurisdiction pursuant to A.R.S. section 12–2101(B).[5]

### THE 1988 LEVY

*Did Former A.R.S. Section 48–1907(6) Authorize the 1988 Levy?*

■ We first consider whether the District was entitled to levy secondary property taxes for the 1988 tax year under former A.R.S. section 48–1907(6) on the ground that it was "operating" its hospital during that year. *See Atchison, Topeka & Santa Fe,* 162 Ariz. at 136–37, 781 P.2d at 614–15. In support of the tax court's judgment, the District argues that the new management agreement executed by Samaritan and the District in December of 1989 was retroactive to July 1, 1987, and was accordingly in effect during tax year 1988. The District cites *American Cyanamid Co. v. Ring,* 248 Ga. 673, 286 S.E.2d 1 (1982), for the proposition that the parties to a contract may make it retroactively effective and be bound as of an agreed date.

■ This is certainly a correct legal proposition, but it is immaterial to the analysis here. Parties to a contract may agree retroactively to alter their legal rights with respect to each other based on facts that have already occurred, but they cannot by agreement alter the nature of those past occurrences themselves. The crucial inquiry here is not whether Samaritan and the District agreed to govern their legal rights as if the District had been the hospital's operator instead of Samaritan, but rather whether the District *actually operated* the hospital during 1988.

■ We assume *arguendo* that the terms of the new management agreement between the District and Samaritan were such that, if they had truly been implemented during 1988, the District might be characterized as actually having operated its hospital during that time. Nevertheless, the record contains undisputed evidence that the terms of the agreement were not so implemented. The District's own vice president averred:

(7) Samaritan began operating the hospital on August 29, 1986.

(8) The July 1, 1986 one-year management agreement between the District, Samaritan and the city has not been extended pursuant to the extension provisions contained therein.

(9) Subsequent to June 30, 1987, and to the date hereof [April 26, 1988], *Samaritan has continued to operate the hospital on a month-to-month basis on the same terms and conditions as contained in the July 1, 1986 management agreement.*

(Emphasis added.) The District produced no evidence that anything happened before December of 1989, when the District and Samaritan executed the new management agreement, to change or interrupt Samaritan's continued operation of the hospital under the agreement of July 1, 1986.

In *Atchison, Topeka & Santa Fe,* we held that Samaritan's performance under the agreement of July 1, 1986, was such that it was Samaritan and not the District that "operated" the Williams Hospital facility within the meaning of A.R.S. section 48–1907(6). 162 Ariz at 136–37, 781 P.2d at 614–15. Because the District failed to demonstrate any change in those circumstances, A.R.S. section 48–1907(6) did not authorize the District's 1988 secondary property tax levy.

*Did the 1988 Act's Authorization of the 1988 Secondary Property Tax Levy Violate the Arizona Constitution's Prohibition Against Special Laws?*

■ The only other legal basis upon which the District's 1988 secondary property tax levy might be sustained is the 1988 act.[6] The taxpayers argue that the 1988 act could not authorize the 1988 secondary property tax levy, because the act constituted special legislation in violation of the

---

5. The appeal was assigned to Department T of this court pursuant to A.R.S. sections 12–120.-04(G) and 12–170.

6. The 1988 act is quoted in full, *supra,* note 4, at pages 99–100.

Arizona Constitution, article IV, part 2, section 19, subsections (9) and (20), which provide:

> No local or special laws shall be enacted in any of the following cases, that is to say:
>
> .       .       .       .       .
>
> (9) Assessment and collection of taxes.
>
> .       .       .       .       .
>
> (20) When a general law can be made applicable.

The Arizona courts recognize a strong presumption in favor of a statute's constitutionality. *Republic Investment Fund I v. Town of Surprise*, 166 Ariz. 143, 800 P.2d 1251 (1990). "Nonetheless, courts will not refrain from declaring a legislative act an unconstitutional special or local law when the facts so require." *Id.* at 148, 800 P.2d at 1256.

The District urges that the 1988 act does not run afoul of the special law prohibition. It asserts that the act sought to clarify existing law and not specifically to benefit the District. The District argues that the 1988 act created no immutable categories. It observes that the act applies to all hospital districts, not just to those that levied a secondary property tax for funding 1987–1988 operation of a hospital. It also contends that the act's differential treatment of hospital districts depending upon whether they leased or operated their hospitals was permissible because a rational basis existed for the distinction and the categories were elastic.

■ We cannot agree with the District and the tax court that the 1988 act does not violate the Arizona Constitution's prohibition against special laws. A statute that is drafted in general terms may permissibly apply to a finite number of known specific individuals or companies without violating the prohibition against special laws, but only if it may potentially have a broader application in the future. *See Arizona Downs v. Arizona Horsemen's Foundation*, 130 Ariz. 550, 637 P.2d 1053 (1981); *Fund Manager v. Corbin*, 161 Ariz. 348, 360, 778 P.2d 1244, 1256 (App.1988), *approved in pertinent part*, 161 Ariz. 364,

778 P.2d 1260 (1989). Our supreme court's most recent statement of the governing analysis appears in *Republic Investment Fund*, in which the court stated:

> Looking to earlier opinions of this Court, the Court of Appeals, Division One, phrased the test for analysis under the special law provision as follows:
>
> > [T]he court must first ascertain whether the law has a rational relationship to a legitimate legislative objective. If it does not, of course, our inquiry is over. But if it does, we must further decide if the act legitimately classifies by population, geography, or time limitations. If we find a legitimate classification, we must then determine if the act permits other individuals or entities to come within the class, and thus within operation of the law, within a reasonable time, or if at all. [*Petitioners for Deannexation v. City of Goodyear,*] 160 Ariz. [467,] 472, 773 P.2d [1026,] 1031 [ (App.1989) ] (citations omitted).
>
> To determine whether a law is a general law, as opposed to a special or local law, therefore, we consider two factors in addition to whether the classification has a reasonable basis: (1) whether the classification encompasses all members of the relevant class; and (2) whether the class is elastic, allowing members to move into and out of the class. *Arizona Downs*, 130 Ariz. at 557–58, 637 P.2d at 1060–61.

166 Ariz. at 149, 800 P.2d at 1257 (footnote omitted).

In this case, we assume *arguendo* the legitimacy of the classifications drawn by the 1988 act. We conclude, however, that the act fails to satisfy the remaining two prongs of the test.

To be general, a law need not operate on every person, place, or thing within the state; however, it must apply uniformly to all cases and to all members within the circumstances provided for by the law. *Arizona Downs*, 130 Ariz. at 558, 637 P.2d at 1061.... A law may be general and still apply to only one entity, if that entity is the only member of a legitimate class. *See generally* 2 E. McQuillan, [*The Law of Municipal Cor-*

*porations* (3d ed. 1988) ] § 4.44, at 109 ("[A] general law may operate only in a particular county and only affect a small group of persons at the time of its enactment.... [T]he statute must apply equally to all in a similar situation coming within its scope.").

*Republic Investment Fund,* 166 Ariz. at 150, 800 P.2d at 1258.

In the present case, contrary to the District's analysis, the 1988 act does not apply generally to all Arizona hospital districts. The act, by its terms, applies only to hospital districts that were in existence in fiscal year 1988–89 and potentially in a position to levy secondary property taxes for that year. The 1988 act is wholly inoperative with respect to any later-formed hospital district.

The court in *Republic Investment Fund* also stated:

A statute is special or local if it is worded such that its scope is limited to a particular case and it "looks to no broader application in the future." *Arizona Downs,* 130 Ariz. at 558, 637 P.2d at 1061; *see also Barbee v. Holbrook,* 91 Ariz. 263, 265, 371 P.2d 886, 888 (1962); *Luhrs v. City of Phoenix,* 52 Ariz. 438, 451, 83 P.2d 283, 289 (1938). To be general, the classification must be elastic, or open, not only to admit entry of additional persons, places, or things attaining the requisite characteristics, but also to enable others to exit the statute's coverage when they no longer have those characteristics.

.          .          .          .          .

A statute worded so as to admit entry and exit from the class implies that the class formation was separate from consideration of particular persons, places, or things and, thus, not intended as special or local in operation. J. Winters, [*State Constitutional Limitations on Solutions of Metropolitan Area Problems* (1961) ], at 93. Although the number in the class is not determinative, as that number decreases in size, courts are more likely to find the classification invalid. *Id.* A classification limited to a population as of a particular census or date is a typical form of defective closed class; such an act is a form of identification, not of classification, because it is impossible for entities to enter or exit the class with changes in population. *Id.;* [2 N. Singer *Sutherland Statutes & Statutory Construction* (4th ed. 1986) ], § 40.-09, at 233. To decide whether a statute legitimately classifies, we will consider the actual probability that others will come under the act's operation when the population changes. Where the prospect is only theoretical, and not probable, we will find the act special or local in nature. 166 Ariz. at 150–51, 800 P.2d at 1258-59 (footnote and other citations omitted). The time-based classification created by the 1988 act is plainly closed and inelastic. No future change of circumstances could possibly cause any current member of the class affected by the 1988 act to fall outside its provisions, or any current nonmember of the class to come within them.

We conclude that the 1988 act constituted a special law within the prohibition of article IV, part 2, section 19, of the Arizona Constitution. As the Arizona legislature itself demonstrated by enacting the 1989 act, a general law could have been made applicable in its place. *See* Ariz.Const. art. IV, pt. 2, § 19(20). The 1988 act was therefore invalid and could not authorize the District's 1988 secondary property tax levy.

### THE 1989 LEVY

■ The 1989 act amended A.R.S. section 48–1907 to include subsection (A)(6), allowing a hospital district to "[i]mpose a secondary property tax on all taxable property within the district for the purpose of funding the operation and maintenance of any hospital or combined hospital and ambulance service that is owned ~~and~~ OR operated by the district." Former A.R.S. section 48–1907(6), as interpreted by *Atchison, Topeka & Santa Fe Railway Co.,* allowed a hospital district to impose a secondary property tax to fund the operation and maintenance of a hospital only if the District operated as well as owned the hospital. As we observed above, the record contains no evidence to support the view

that the District operated its Williams Hospital facility at any time before December of 1989, when the District and Samaritan executed a new management agreement. Accordingly, the District was statutorily authorized to impose its 1989 secondary property tax only if the 1989 amendment to A.R.S. section 48–1907 applied to the 1989 tax year.

■ We hold that it did not. The 1989 act authorized hospital districts, for the first time, to levy secondary property taxes to fund the operation and maintenance of hospitals that they owned regardless of whether they actually "operated" the hospitals. We reject the District's assertion that the 1989 act only affected one of the many procedural steps in the imposition and collection of District taxes. Amended A.R.S. section 48–1907 created a new legal right rather than merely prescribing a method for enforcing an existing right or obtaining redress. It therefore constituted a change in the substantive law. *See Allen v. Fisher,* 118 Ariz. 95, 574 P.2d 1314 (App. 1977). As such, the amendments could not be applied retroactively without an express legislative declaration to that effect. *See* A.R.S. § 1–244; *State v. Coconino County Superior Court,* 139 Ariz. 422, 678 P.2d 1386 (1984); *Bouldin v. Turek,* 125 Ariz. 77, 607 P.2d 954 (1979). Because the 1989 act contained no such declaration, it did not become effective until September 15, 1989.

Under A.R.S. section 42–304(B), a secondary property tax for the 1988–89 tax year could only be levied on the District's behalf on or before August 21, 1989.[7] On the facts disclosed by this record, the 1989 amendment to A.R.S. section 48–1907 was the only potential source of legal authority for the District to impose such a tax. Because the amendment did not become effective until September 15, 1989, however, the District's 1989 secondary property tax levy was unauthorized and invalid.

The District's reliance upon *In re Dos Cabezas Power District,* 17 Ariz.App. 414, 498 P.2d 488 (1972), and *Bland v. Jordan,* 79 Ariz. 384, 291 P.2d 205 (1955), *overruled in part on other grounds by Kleindienst v. Jordan,* 93 Ariz. 188, 379 P.2d 463 (1963), is misplaced. In *Dos Cabezas,* Division Two of this court wrote:

What happens when a statute is amended *while proceedings are going on under the old statute*? The general rule is that when proceedings are in process under a statute and have not been completed, and a new act passed modifying the statute under which the proceedings were begun, the new statute becomes integrated into part of the old statute as fully as if written therein from the very time the old statute was enacted. A statute modifying a previous statute has the same effect as though the statute had all the while previously existed in the same language as that contained in the modified statute, unless the modifying statute contains a saving clause. Every right or remedy created solely by a modified statute disappears or falls within the modified statute unless carried to final judgment before the repeal or modification, save that no such repeal or modification shall be permitted to impair the obligation of a contract or to abrogate a vested right.

*Id.* 17 Ariz.App. at 420, 498 P.2d at 494 (citations omitted). In *Dos Cabezas,* the statutory procedure for organizing a new power district was in process, but had not been completed as of the effective date of a statutory amendment that, if applied, would have precluded the creation of the proposed district. In the present case, however, the steps for levying a secondary property tax on behalf of the District for tax years 1988–89 had to be complete as of August 21, 1989. *See* A.R.S. § 42–304(B). The amendment of the controlling statute became operative only after the date on which the "deal was done"—i.e., the date on which the taxpayers' liability was fixed. *See Hamilton v. Superior Court,* 154 Ariz. 109, 111, 741 P.2d 242, 244 (1987) (transac-

---

**7.** Section 42–304(B) provides in relevant part:
The governing body of each county, community college district, school district, city or town, on or before the third Monday in Au-

gust each year, shall fix, levy, and assess the amount to be raised from primary property taxation and secondary property taxation.

tion is beyond reach of new law after stage at which either party could have "backed out" without legal consequence).

The District cites *Bland* for the proposition that a statute, once enacted, becomes the law of Arizona even if it does not become operative immediately. The issue in *Bland* was whether a statute raising the salary of the state post auditor violated article IV, part 2, section 17, of the Arizona Constitution, which prohibits "increasing the compensation of a public officer during his term of office." The salary increase law was approved by the governor and filed with the secretary of state before the beginning of the post auditor's term, but did not become operative until several days after the term had begun. Observing that the purpose of the constitutional provision was to protect the public against the evil of allowing a public official to use his official power to augment his salary and to remove the temptation from lawmakers to control other branches of government by promises of reward or threats of punishment, the court stated:

> The salary attached to this office at the beginning of its term was definitely fixed by law to be operative on a certain date (in the absence of a demand for a referendum), not by virtue of any subsequent action on the part of the legislature but solely by the automatic operation of the Act and the Constitution working together.

> Such a holding does not violate the letter or the spirit of the constitutional provision prohibiting an increase or decrease in salary during a term.

79 Ariz. at 388, 291 P.2d at 207. The court did not hold that the salary increase legislation was operative immediately upon its enactment. It held only that the relevant date under article IV, part 2, section 17, of the Arizona Constitution was the date on which the legislation was signed by the governor and filed in the office of the secretary of state.

Because we hold that the 1989 amendment to A.R.S. section 48–1907 was inapplicable to the 1989 tax year, we need not consider the taxpayers' argument that the District's failure to lease its hospital under the terms of A.R.S. section 48–1911 disqualified it from levying a secondary property tax under new section 48–1907(A)(6). We also need not consider whether the manner in which the District conducted its lease-auction under A.R.S. section 48–1911(B) excused its failure to lease the hospital under the terms and conditions imposed by section 48–1911(A).

The judgment of the tax court is reversed, and the matter is remanded for proceedings consistent with this opinion.

EHRLICH, P.J., and LEVI RAY HAIRE, J., concur.

Note: The Honorable LEVI RAY HAIRE, a retired Judge of the Arizona Court of Appeals, was authorized to participate in this appeal by order of the Chief Justice of the Arizona Supreme Court pursuant to article VI, section 20, of the Arizona Constitution and A.R.S. section 38–813.